## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **REDZONE WIRELESS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:16-cv-00595-JDL** |
| | ) | |
| **NETGEAR, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT[1]

Redzone Wireless, LLC ("Redzone"), provides wireless broadband Internet services to residential and business customers in Maine.   NETGEAR, Inc. ("NETGEAR"), is a global manufacturer of networking equipment including wireless routers and gateways.   In this action, Redzone asserts that Internet routers it purchased from NETGEAR are defective.   Redzone further asserts that NETGEAR sold the LTE Routers with knowledge of the defects, made misrepresentations during the negotiation of the sale to Redzone, and is in breach of their contract.   NETGEAR moves for summary judgment on all counts (ECF No. 124).

Redzone opposes NETGEAR's motion for summary judgment and also moves for partial summary judgment (ECF No. 121) on certain of the fifteen (15) affirmative defenses NETGEAR asserts in its Answer to the Second Amended Complaint (ECF No. 69).   Specifically, Redzone argues that it is entitled to summary judgment on NETGEAR's Third (No Warranties) and Fourth (Purchase and Sale of Goods "As Is")

---

[1]  This opinion is **SEALED** until 5:00 p.m. on Friday, September 27, 2019, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion(s) need to be redacted because of confidentiality restrictions.

Affirmative Defenses in their entirety because the undisputed facts show that it did not disclaim all warranties in its contracts with NETGEAR.  For the same reason, Redzone argues that it is entitled to summary judgment on NETGEAR's Second (Full Performance), Fifth (Unclean Hands / Failure to Do Equity), Sixth (Estoppel), Eighth (Waiver), Ninth (Bad Faith), and Tenth (Excuse) Affirmative Defenses to the extent they are based on NETGEAR's argument that Redzone disclaimed all warranties. Redzone also moves for summary judgment on NETGEAR's Seventh Affirmative Defense (Laches) on separate grounds.

I grant Redzone's motion for summary judgment in favor of Redzone on NETGEAR's affirmative defense for laches.  Because I conclude that there are genuine disputes of material fact as to all other issues, both motions are otherwise denied.

## I. FACTUAL BACKGROUND

Sometime before 2014, Sprint Corporation ("Sprint") commissioned NETGEAR to manufacture an Internet gateway router called the LG6100D LTE Gateway (the "LTE Router") specifically for Sprint's network, and Sprint began selling the LTE Router in 2014.[2]  In March 2015, Redzone contacted NETGEAR to inquire about testing the LTE Router on its network.  At the time, NETGEAR had excess inventory of the LTE Routers.  The excess LTE Routers had Sprint logos, were packaged in Sprint-branded boxes, contained a Sprint SIM (Subscriber Identification Module) card, had Sprint network settings, and had a Sprint user interface.  The parties

---

[2]  An Internet router is "an electronic device that transmits and receives data via radio signals to and from other WiFi enabled devices."  *Cablevision Sys. Corp. v. Verizon N.Y. Inc.*, 119 F. Supp. 3d 39, 44 (E.D.N.Y. 2015).

dispute the cause of NETGEAR's excess inventory.  Redzone argues that a "data stall" problem with the LTE Routers caused Sprint's sales of the LTE Router to slow to a halt.  While NETGEAR admits that Sprint experienced data stall issues with the LTE Routers, it contends that Sprint's sales forecasts overestimated Sprint's actual needs.

The parties also dispute what NETGEAR communicated to Redzone as to the reason why Sprint did not purchase NETGEAR's remaining inventory of LTE Routers.  Redzone asserts as fact that its CEO, Jim McKenna, asked Mike Wyckoff, a member of NETGEAR's marketing team, why Sprint had not purchased the LTE Routers that were in NETGEAR's inventory.  ECF No. 142 ¶ 46.  NETGEAR denies that McKenna asked Wyckoff the question.  Redzone further asserts, but NETGEAR denies, that Wyckoff responded to McKenna that Sprint "had just decided to take a different direction in their business."  ECF No. 142 ¶ 47.

Redzone was interested in NETGEAR's LTE Routers in part because Redzone had an immediate need for routers for its new LTE network,[3] and NETGEAR's LTE Routers were already manufactured and available to be shipped and deployed immediately.  Negotiations focused, in part, on whether the LTE Routers, customized for Sprint, would work on Redzone's network.  Wyckoff was one of NETGEAR's primary liaisons with Redzone during negotiations.  At various times during the negotiations, Wyckoff referred to the LTE Routers as being sold "as is" both internally and in communications with Redzone.  As explained below, the parties' disagreement as to the meaning of the term "as is" is central to this litigation.  On March 27,

---

[3]  Long Term Evolution ("LTE") is a technical standard for wireless communications.  *Adaptix, Inc. v. Ericsson, Inc.*, 115 F. Supp. 3d 837, 841 (E.D. Tex. 2015).

Wyckoff sent McKenna an engineering support plan and a price quote for the LTE Routers which included the term "as is."

On April 4, Redzone asked NETGEAR to unlock 50 LTE Routers and provide custom firmware so that Redzone could beta-test the LTE Routers prior to purchasing them in large quantities.  On or about April 6, Redzone and NETGEAR entered into the "NETGEAR, Inc. Standard Terms and Conditions" agreement (the "Standard Agreement") to "govern all purchase orders submitted by [Redzone] and accepted by NETGEAR."  ECF No. 1-1 at 1.  The Standard Agreement contained a "Hardware Warranty" and a "Software Warranty."  *Id.*  On April 15, Redzone purchased 50 LTE Routers that were customized by NETGEAR so that they would connect to Redzone's network for beta-testing.  Redzone then engaged in beta-testing.

The parties dispute the scope of the testing contemplated by the agreement.  Redzone contends that it was only to test whether the LTE Routers would connect to its network, while NETGEAR contends that Redzone was to test a broader range of criteria, including the longevity of the LTE Routers' data connection.

The parties also dispute the nature of the testing Redzone conducted and what that testing revealed.  NETGEAR contends that ten Redzone customers used the LTE Routers in real-world conditions for over a month and that several of them experienced service interruptions referred to as "data stalls."  Redzone argues that only eight testers used the LTE Routers, that they were not Redzone customers, and that only one tester indicated that he or she experienced frequent service interruptions.  Redzone further asserts that the service interruptions were not

4

understood to be data stalls and that Redzone did not know whether the LTE Router was causing the problem.

Redzone and NETGEAR concluded that the LTE Routers would not work for Redzone in their default Sprint configuration and agreed that NETGEAR would have to perform some limited non-recurring engineering for the LTE Routers to work for Redzone. On or about May 13, 2015, the parties entered into the Redzone Wireless Custom LG6100 SKU Side Letter Agreement (the "Side Letter Agreement"). ECF No. 1-2. The purpose of the Side Letter Agreement was to "document the parties' agreement to certain additional terms to the [Standard Agreement]." *Id.* at 1. In particular, the Side Letter Agreement memorialized that NETGEAR would assist in creating custom Redzone firmware for the LTE Router.

Pursuant to the Side Letter Agreement, Redzone agreed to purchase and take delivery of 4000 LTE Routers at a cost of $115.00 per unit. The section of the Side Letter Agreement entitled "Logistics and Packaging" stated in pertinent part: "NETGEAR shall deliver the Product 'as is' to [Redzone], and . . . [Redzone] will reconfigure and repackage the Product at [Redzone's] cost and at [Redzone's] own site for [Redzone's] specific needs." ECF No. 1-2 at 1. In addition, Redzone agreed to pay NETGEAR a non-recurring engineering fee of $50,000 for the creation of the custom Redzone firmware, and NETGEAR agreed to provide the custom firmware and other deliverables identified in the Side Letter Agreement to Redzone.

Redzone took delivery of the LTE Routers in mid-June 2015. Pursuant to the "Draft Schedule" in the Side Letter Agreement, Redzone had seven weeks from the execution of the Side Letter Agreement to provide its final acceptance of the LTE

Routers.  Redzone gave final and formal written acceptance of the LTE Routers pursuant to the Side Letter Agreement on June 16, 2015.

One month later, on July 16, 2015, Redzone reported to NETGEAR by e-mail: "[W]e seem to be having some random/intermittent LTE disconnects with the LTE Routers.  Customers report loss of IP connectivity, and we need to walk them through a reboot in order to get the device back online.  Have Sprint customers experienced this issue, and if so did Netgear implement a fix?"  ECF No. 143 ¶ 65.  After receiving Redzone's e-mail, one of NETGEAR's engineers forwarded it to another NETGEAR engineer, writing:  "FYI, I gave the latest test build to Sprint and they are experiencing the same thing with random disconnects even with the work around [frown face emoji]."  *Id.* ¶ 67.  NETGEAR did not respond to Redzone's question about whether Sprint had experienced similar problems, but NETGEAR did begin to troubleshoot Redzone's reports of the LTE Router's internet disconnections.

On October 16, 2015, Redzone informed NETGEAR that it had experienced a "significant increase in customer reported disconnects" across all of its sites, and that "[u]sers generally report having LTE Signal and the Internet indicator LED is lit, but they are unable to get online and we cannot remotely communicate with the modem." ECF No. 133-2 ¶ 59.  In December, NETGEAR provided a software update to Redzone to address the disconnect issues, though the parties dispute its efficacy.  Despite the update, Redzone continued to report customer connectivity problems with the LTE Routers, and NETGEAR continued to provide troubleshooting support.  NETGEAR's support ended on September 9, 2016, when NETGEAR informed Redzone that no root

cause had been detected despite months of troubleshooting and that it would not provide further support to Redzone for the apparent data stall issues.

Redzone notified NETGEAR that it was revoking its acceptance of the LTE Routers on September 27, 2016.  On October 3, 2016, NETGEAR filed a declaratory judgment action against Redzone in California state court—later removed to the United States District Court for the Northern District of California—seeking a judicial declaration that NETGEAR was "no longer obligated to devote further time and resources to the connectivity issues being experienced by Redzone's customers." ECF No. 136 ¶ 65.  That action was subsequently dismissed for lack of personal jurisdiction by an order dated May 31, 2017.  Redzone filed its complaint in this Court on December 2, 2016.

## II.  LEGAL ANALYSIS

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).   Issues are considered genuine "if the evidence of record permits a rational factfinder to resolve [the issue] in favor of either party . . . ." *Id.* (quoting *Borges*, 605 F.3d at 4).  The facts in the record are construed in the light most favorable to the nonmoving party and all reasonable inferences are resolved in the nonmoving party's favor. *See Braga v. Genlyte Group, Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).

Although NETGEAR moves for summary judgment on all of Redzone's claims, two issues predominate:  First, NETGEAR argues that the "as is" language in the Side Letter Agreement precludes Redzone's claims for both revocation of acceptance and breach of warranty.  Redzone, conversely, argues that the "as is" language does not disclaim the express warranties in the Standard Agreement.  Accordingly, Redzone argues that it is entitled to summary judgment in its favor on that issue, which in turn warrants summary judgment in its favor on the majority of NETGEAR's affirmative defenses.  Second, NETGEAR argues that Redzone's claims for fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation fail as a matter of law because Redzone could not have justifiably relied on any alleged misrepresentations and because the claims are barred by the economic loss doctrine.  I address these issues, in order, before addressing NETGEAR's arguments concerning Redzone's other claims and Redzone's argument for summary judgment on NETGEAR's affirmative defense for laches.

## A.     Revocation of Acceptance and Breach of Warranty

NETGEAR argues that Redzone's claims for revocation of acceptance (Count I) and breach of warranty (Count II) fail because Redzone purchased the LTE Routers "as is."   NETGEAR further argues that even if the warranty claims were not disclaimed by the "as is" contractual language, the hardware warranty is inapplicable and NETGEAR satisfied the requirements of the software warranty.

### 1.     The "As Is" Disclaimer

The Side Letter Agreement states that "NETGEAR shall deliver the Product 'as is' to [Redzone], and, other than the specific exceptions described below, [Redzone]

will reconfigure and repackage the Product at [Redzone's] cost and at [Redzone's] own site for [Redzone's] specific needs."  ECF No. 1-2 at 1.  NETGEAR argues that this "as is" language constitutes a disclaimer, precluding Redzone's claims for revocation of acceptance and breach of warranty.  Redzone, on the other hand, argues that the undisputed facts demonstrate that the parties understood the "as is" language only to mean that NETGEAR initially expected the LTE Routers would work for Redzone without modification and as configured, branded, and packaged for Sprint, but not to disclaim contractual warranties.  Redzone therefore contends that it is undisputed that it did not disclaim the warranties, and that it is entitled to summary judgment on that issue.  NETGEAR, in turn, disputes that the facts support Redzone's interpretation.

The summary judgment record presents clear disputes of fact as to the meaning of the "as is" provision in the Side Letter Agreement.  In both NETGEAR's internal communications and in its communications with Redzone, there is evidence that throughout the negotiation process NETGEAR understood "as is" as referring to the configuration, branding, and packaging of the LTE Routers.  For example, Wyckoff stated in an email to Redzone about LTE Router pricing that "the only SKU [Stock Keeping Unit] [NETGEAR] offer[s] for the [LTE Router] is locked on Sprint, and we are hoping the product will meet your requirements 'as is.'"  ECF No. 143 ¶ 37.  Similarly, in an email to a colleague at NETGEAR about the negotiations, Wyckoff stated: "Hey Steve.  Any progress in vetting this [deal]?  I told [Redzone] from the beginning that the product was offered 'as is' and hoped it would work in their environment.  Obviously, he is sold on the device, but will not work 'as is.'"  ECF

No. 136 ¶ 11.  At another point, Wyckoff emailed a NETGEAR engineer, stating in part: "I have been dealing with Jim McKenna {[Redzone] Pres & CEO} directly.  If the [LTE Router] works on their network 'as is', he will buy 4,000 units."  ECF No. 143 ¶ 41.  The engineer responded: "I am pretty confident it will not work as is."  *Id*.  These communications all support interpreting "as is" as not referring to legal warranties but instead referring to whether the LTE Routers would work "out of the box" as configured for Sprint.

This understanding of "as is" is also supported by the testimony of the NETGEAR employee who drafted the statement of work that became the Side Letter Agreement.  He testified at his deposition that he interpreted Subsection 1.1—which contained the "as is" language—as meaning that "the product was arriving to [Redzone] as Sprint product, and they wanted to rebrand it as Redzone product."  ECF No. 136 ¶ 27.

However, Wyckoff also testified at his deposition that "as is" was used in two different ways during the contract negotiations:

> Q.  So your testimony is, in the midst of these discussions you begin using a different meaning of the term 'as is,' even in the same e-mail we saw; right?
>
> A.  That is correct.
>
> Q.  To go from present configuration to no warranties; right? . . .
>
> A.  Correct.

ECF No. 133-1 at 20.  This evidence belies Redzone's contention that the parties indisputably understood "as is" as referring only to the branding and configuration of

the LTE Routers and thus creates a dispute of fact as to the parties' understanding of the term "as is."

NETGEAR argues that the dispute regarding the intended meaning of "as is" is immaterial because Redzone never disclosed its understanding of "as is" to NETGEAR, and basic rules of contract interpretation under California law dictate that a party's undisclosed understanding of a contract term is irrelevant to the meaning of that term.[4]   *See* ECF No. 124 at 24 (citing *SCC Alameda Point LLC v. City of Alameda*, 897 F. Supp. 2d 886, 897 (N.D. Cal. 2012)).   But this argument does not account for another rule of contract interpretation that may control this issue. Uniform Commercial Code ("UCC") Section 2-316(1) requires that purported words of disclaimer be read as consistent with an express warranty whenever it is reasonable to do so, and if it is not reasonable to do so, then the disclaimer is inoperative and the warranty survives:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence . . . negation or limitation is inoperative to the extent that such construction is unreasonable.

U.C.C. § 2-316(1) (West 2019); Cal. Com. Code § 2316(1) (Westlaw through Ch. 161 of 2019 Reg. Sess.);  11 M.R.S.A. § 2-316(1) (Westlaw through Ch. 505 of 2019 1st Reg. Sess. of 129th Leg.).

Here, the parties' agreement contains both the express warranties in the Standard Agreement and the "as is" language in the Side Agreement.  The question

---

[4] Because the Standard Agreement states that it is governed by California law, I apply California law to the claims and defenses based on the contract.  *See* ECF No. 1-1 ¶ 6.2.

of whether UCC Section 2-316(1) governs depends upon whether the words "as is" "tend[] to negate or limit warranty." As discussed above, there is conflicting evidence in the record on this issue. Because the proper construction of this contract term turns on the resolution of this factual dispute, the dispute is material, and summary judgment is not warranted.

## 2. The Terms of the Warranties

NETGEAR argues that even if the "as is" language in the Side Letter Agreement did not disclaim all warranties, the hardware warranty does not apply to Redzone's allegations because the data stall issue affecting the LTE Routers was not a "defect in workmanship and materials" as contemplated by the Standard Agreement.[5] ECF No. 1-1 ¶ 3.2.

Under California law, the phrase "free from defects in material and workmanship" refers only to manufacturing defects, not design defects. *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017). A manufacturing defect exists when "an item is produced in a substandard condition." *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002). A manufacturing defect can be established by showing that the product "differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Barker v.*

---

[5] The Standard Agreement contains the following Hardware Warranty:

> NETGEAR warrants to the end-user that each item of Hardware will be free from defects in workmanship and materials for its respective warranty period, which begins on the date of purchase by the end user. End-users' exclusive remedy and NETGEAR's sole obligation and liability under this warranty is to promptly repair or replace any failed component returned by [Redzone] on behalf of an end-user because of defects in workmanship or material.

ECF No. 1-1 ¶ 3.2.

*Lull Eng'g Co.*, 20 Cal. 3d 413, 429 (1978); *see also McCabe*, 100 Cal. App. 4th at 1120. "A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective." *McCabe*, 100 Cal. App. 4th at 1120.

The summary judgment record indicates that NETGEAR stopped searching for a fix for the data stall problem without understanding its root cause, which suggests that the source of the alleged defect had not been determined at that point. Beyond establishing this uncertainty, the summary judgment record does not speak directly to the type of defect—manufacturing or design—the LTE Routers allegedly suffered. The parties' arguments on this point focus on two issues.

First, the parties dispute whether the LTE Routers were the cause of the data stalls that Redzone customers were experiencing. NETGEAR argues that Redzone customers' complaints about vague disconnect issues have not been definitively traced to the LTE Routers. Redzone points out that certain NETGEAR e-mails and other documents identify a specific component of the LTE Routers that NETGEAR believed to be at fault for the data stall issues—the USB host controller, which would "lock up." ECF No. 143 ¶ 30. Redzone also notes that Sprint customers using the LTE Routers complained about the same disconnect issues, which suggests that the LTE Routers may have caused the data stalls. These arguments do not speak to whether the defect, if one existed, was a manufacturing defect or a design defect and thus do not address whether the hardware warranty applies.

Second, the parties dispute the number of Redzone customers who experienced the data stalls. NETGEAR contends that most of the LTE Routers worked in the

field and that only a handful of Redzone customers complained about the LTE Routers. But there is also evidence that numerous LTE Routers experienced significant problems and that many customers complained about the data stall issue. The number of products affected by an alleged defect can be relevant to determining whether a party has alleged a design defect or a manufacturing defect. *See Rollolazo v. BMW of N. Am.*, No. CV 16-00966, 2017 WL 6888501, at *8 (C.D. Cal. May 2, 2017) ("Where a defect is common to all [products], such defect is typically considered one of design, rather than a manufacturing defect."). Thus, in the absence of any direct evidence as to the type of defect that the LTE Routers allegedly suffered from, the conflicting evidence about the number of allegedly defective LTE Routers creates a genuine dispute of material fact precluding summary judgment on the issue of whether the hardware warranty applies to the LTE Router.

NETGEAR also argues that it complied with the software warranty by providing a workaround for the alleged problem. The Software Warranty requires a "suitable fix, patch or workaround."[6] ECF No. 1-1 ¶ 3.3. Redzone argues that what constitutes a "suitable" workaround is a question of fact for the jury. Furthermore, Redzone asserts that the workaround NETGEAR provided did not work in every instance, and even when it did work, customers were frequently disconnected from

---

[6] The Standard Agreement contains a Software Warranty, which states in relevant part:

> NETGEAR warrants to the end-user that each item of Software . . . will function during its respective warranty period substantially as described in the user documentation supplied by NETGEAR with the Software. If any item of Software fails to so perform during its warranty period, as the sole remedy NETGEAR or NETGEAR's supplier will at its discretion provide a suitable fix, patch or workaround for the problem that may be included in a future revision of the Software . . . .

ECF No. 1-1 ¶ 3.3.

the Internet and continued to complain.  There is also evidence that on at least one occasion, Redzone communicated to NETGEAR that NETGEAR's proposed workaround to the data stall problem—revised firmware that would automatically reboot an LTE Router that had lost connectivity—was "not an acceptable solution to the problem."  ECF No. 114-9 at 3.  This evidence demonstrates another dispute of material fact which precludes summary judgment on Redzone's claims for revocation of acceptance and breach of warranty.

**B.   Misrepresentation Claims**

Redzone's complaint alleges that during the negotiation of the parties' contracts, NETGEAR misrepresented to Redzone why Sprint did not take delivery of the excess LTE Routers and failed to disclose that Sprint had experienced connectivity and disconnection issues with the LTE Routers.  NETGEAR contends that Redzone's claims for Fraudulent Misrepresentation (Count IV), Fraudulent Inducement (Count V) and Negligent Misrepresentation (Count VI) all fail as a matter of law because Redzone cannot show justifiable reliance—an element of each claim—by clear and convincing evidence.  *See Kearney v. J.P. King Auction Co.*, 265 F.3d 27, 33-34 n.8 (1st Cir. 2001) (applying Maine law) ("Claims for fraudulent and negligent misrepresentation, although obviously distinct, both require that the defendant have made a false representation of present fact and that the plaintiff justifiably relied on the representation as true."); *see also Maine Eye Care Assocs. P.A. v. Gorman*, 942 A.2d 707, 711 (Me. 2008); *Wildes v. Ocean Nat. Bank of Kennebunk*,

498 A.2d 601, 602 (Me. 1985).[7]  NETGEAR further argues that the claims are barred by the economic loss doctrine.  I address both arguments in order.

### 1.    Justifiable Reliance

NETGEAR argues that the Summary Judgment record demonstrates that Redzone did not justifiably rely on any alleged misrepresentations.  It contends that Redzone had a full opportunity to conduct whatever testing it desired and had actual knowledge that the LTE Routers were the cause of the data stall problem before it finally accepted the LTE Routers.  Redzone counters that the testing contemplated by the agreement was not comprehensive and was only intended to ensure that the LTE Routers, which had been designed for Sprint, would work with Redzone's network.  Furthermore, as previously noted, Redzone argues that only one of eight testers experienced a data stall problem and it was not clear then that the problem was caused by the LTE Router.

NETGEAR specifically asserts as undisputed fact that Redzone had reason to know of the data stall issue when it accepted the LTE Routers because Redzone had performed beta-testing and its "[c]ustomers who participated in the beta-testing complained that they experienced data stalls."  ECF No. 133-2, at 18.  Redzone denies this fact, asserting that the only one beta-tester reported frequent service interruptions, and that no beta-tester reported having experienced a "data stall."  ECF No. 133-2, at 19.  Redzone argues that it had no reason to believe it needed to

---

[7]  Because this issue was not extensively briefed by the parties, I assume without deciding that Maine law applies to Redzone's tort claims.  *See* Restatement (Second) of Conflict of Laws § 145(1).  ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which . . . has the most significant relationship to the occurrence and the parties[.]"); *see also Ricci v. Alternative Energy Inc.*, 211 F.3d 157, 165 (1st Cir. 2000) ("Maine applies the provisions of the Restatement (Second) of Conflict of Laws to choice of law determinations in tort cases.").

test the stability of the LTE Routers because NETGEAR had made no mention of the data stall issue, the product's literature stated that the LTE Router provided "a persistent, always-on connection," and Redzone relied on NETGEAR's contractual warranty that the device would perform as advertised.  ECF No. 133-2, at 19.

Thus, there are disputed facts concerning the sufficiency of Redzone's testing, what the testing revealed, and the degree to which Redzone understood, or should have understood, that the LTE Routers were possibly defective.  A buyer's failure to revoke its acceptance of goods after testing and discovering a nonconformity does not preclude a finding of justifiable reliance where there is a genuine factual dispute as to whether the seller's representations were false.  *See C.A.I., Inc. v. Vitex Packaging Corp., Inc.*, 115 F. Supp. 3d 168, 183 (D. Mass 2015).  "A party 'may justifiably rely on the fraudulent misrepresentation of [another] . . . without investigating the truth or falsity of the representation.  Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him.'"  *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 818 A.2d 995, 1003 (Me. 2002) (quoting *Estate of Whitlock*, 615 A.2d 1173, 1176 (Me. 1992)).  Given the disputed facts concerning NETGEAR'S alleged misrepresentations regarding Sprint's experience with the LTE Router, as well as Redzone's testing of the LTE Routers, summary judgment is not warranted on whether NETGEAR's representations about the LTE Routers were misleading or whether Redzone justifiably relied on those representations.

## 2.   Economic Loss Doctrine

NETGEAR further argues that Redzone's claims for fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation are

barred by the economic loss doctrine, which holds that "[c]ourts generally . . . do not permit tort recovery for a defective product's damage to itself." *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 270 (Me. 1995); *see also Fireman's Fund Ins. Co. v. Childs*, 52 F. Supp. 2d 139, 142 (D. Me. 1999) (damage to a product itself "means simply that the product has not met the customer's expectations, or . . . that the customer has received insufficient product value") (internal quotation marks omitted). *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002) ("[T]he need to provide a plaintiff additional tort remedies is diminished greatly when . . . the plaintiff can be made whole under contract law[.]").

NETGEAR contends that because Redzone's claims all center on the LTE Routers' alleged defects, Maine's economic loss doctrine compels the dismissal of Redzone's misrepresentation-based tort claims.  Redzone argues that the economic loss doctrine does not apply because NETGEAR fraudulently induced it to enter into the contract.  Specifically, Redzone contends that it would not have agreed to purchase the LTE Routers and accept the damages limitation provision in the Standard Agreement but for NETGEAR's misrepresentations.  The damages limitation provision limits Redzone's right to recover damages to "the amounts actually paid to NETGEAR for the [LTE Routers]."  ECF No. 1-1 ¶ 5.3.

"It is generally accepted that the economic loss doctrine does not extend to claims of fraud where the alleged misrepresentation is independent of the contract, such as claims for fraud in the inducement." *Am. Aerial Servs., Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111 (D. Me. 2014); see *also G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 591 n.8 (D.N.J. 2014) ("The fraud in the

inducement exception is recognized in a majority of states."). The Maine Law Court has not addressed whether and the extent to which fraud in the inducement is an exception to the economic loss doctrine. However, this Court has previously concluded that the economic loss doctrine would bar a misrepresentation-based tort claim if "the misrepresentation only goes to the quality or quantity of the goods promised in the contract[.]" *Terex USA*, 39 F. Supp. 3d at 111 (interpreting Maine law). Here, NETGEAR's alleged misrepresentations concerned the quality of the LTE Routers, but the complaint also alleges that the misrepresentations induced Redzone to contractually agree to the damages limitations provision in the Standard Agreement. Thus, Redzone not only seeks damages for the defective LTE Routers, it also seeks relief from the contractual limit on those damages which, Redzone argues, would prevent it from being made whole if it is enforced.

"[T]he economic loss doctrine protects parties' abilities to allocate risk by mutual agreement and thereby form reliable expectations about their potential financial exposure with respect to the duties and liabilities that they have contractually assumed." *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 379 (S.D.N.Y. 2010). Conversely, "a party should not be able to exempt himself by contract for harm that he or she intentionally or recklessly causes." Ralph C. Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine*, 90 MARQ. L. REV. 921, 940 (2007). Here, barring Redzone's acceptance of misrepresentation-based tort claims based on the economic loss doctrine would not advance the doctrine's purpose of protecting contracting parties' reasonable expectations if it is ultimately shown that Redzone's acceptance of the damages

limitation provision, and the contract as a whole, was induced by fraud. Thus, the economic loss doctrine does not entitle NETGEAR to summary judgment on Redzone's claims for fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation.

## C. **Redzone's Remaining Claims**

NETGEAR also moves for summary judgment on Redzone's remaining claims, in part reiterating arguments that were unsuccessful at the motion to dismiss stage. *See Redzone Wireless, LLC v. NETGEAR, Inc.*, No. 2:16-CV-00595-JDL, 2018 WL 2770636, at *4-6 (D. Me. June 8, 2018).

First, NETGEAR argues that Redzone's claim for breach of the implied covenant of good faith and fair dealing (Count VII) must be dismissed because Redzone is not entitled to recovery beyond ordinary contract damages. *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394-95 (1990), *as modified on denial of reh'g* (Oct. 31, 2001) (holding that a claim for breach of the implied covenant may be disregarded if it rests on the same set of facts as a claim for breach of contract). As I previously ruled on NETGEAR's motion to dismiss (ECF No. 64), however, "Redzone's claim for breach of the implied covenant of good faith and fair dealing is not premised on facts duplicative of its breach of contract claim, but rather on allegations that NETGEAR actively concealed the LTE Routers' alleged defects *before* (and also after) the contract was executed." *Redzone Wireless,* 2018 WL 2770636, at *5. Thus, because I have concluded that Redzone's fraud and concealment claims survive summary judgment, Redzone's claim for breach of the implied covenant of good faith and fair dealing also survives.

Second, NETGEAR argues that Redzone's unjust enrichment claim (Count III) must be dismissed because the parties had a contractual arrangement and, under Maine and California law, the existence of an express contract between the parties precludes a claim for unjust enrichment. I also rejected this argument in denying NETGEAR's motion to dismiss: "[F]raud in the inducement . . . can constitute unjust conduct for the purposes of unjust enrichment. . . . Furthermore, fraud in the inducement can serve . . . as grounds for rescinding a contract. If the contract between the parties is ultimately rescinded, Redzone may still properly recover on the quasi-contractual theory of unjust enrichment." *Redzone*, 2018 WL 2770636, at *4 (citation omitted). Because Redzone's claims for fraud—including fraudulent inducement—survive summary judgment, as discussed above, summary judgment is unwarranted on Redzone's claim for unjust enrichment.

Finally, NETGEAR argues that Redzone's claim under California's Unfair Competition Law ("UCL") (Count VIII) fails as a matter of law because Redzone cannot prove NETGEAR's conduct was unlawful, unfair, or fraudulent as required by the statute. Cal. Bus. & Prof. Code § 17200, *et seq.* (defining unfair competition as "any unlawful, unfair or fraudulent business act or practice . . . ."). Again, as I concluded in my order denying NETGEAR's motion to dismiss, *Redzone*, 2018 WL 2770636, at *6, there is a basis for Redzone's claim under the unfairness prong of the UCL because the evidence in the record, viewed in the light most favorable to Redzone, provides a basis on which a jury could conclude that NETGEAR's conduct was "immoral, unethical, oppressive, or unscrupulous." *See McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) ("A business practice is unfair within

the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.").   Summary judgment is therefore inappropriate on this claim.

## D.   Laches

Redzone moves for summary judgment on NETGEAR's Seventh Affirmative Defense, which asserts that Redzone's claims are barred by the doctrine of laches. Laches is an equitable doctrine and, as such, is not a defense to claims for money damages.  *Strickland v. Cousens Realty, Inc.*, 484 A.2d 1006, 1008 (Me. 1984); *Abbott v. City of Los Angeles*, 50 Cal. 2d 438, 461–62 (1958).[8]  Because Redzone brings only claims for money damages in this action, laches is not a defense to any of Redzone's claims.  This alone is sufficient to grant summary judgment in favor of Redzone on NETGEAR's laches defense.

Even if laches were available as a defense, NETGEAR would not be able to establish it as a matter of law.  Laches applies where there has been a "negligent or willful failure [of a party] to assert his rights."  *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 187 (D. Me. 2008) (quoting *Valmor Prods. Co. v. Standard Prods. Corp.*, 464 F.2d 200, 204 (1st Cir. 1972)); *see also Pease v. Zapf*, 26 Cal. App. 5th 293, 300 (2018).  To "bar the assertion of a claim, laches requires that the party's delay in bringing the lawsuit was 1) unreasonable, and 2) resulted in prejudice to the opposing party." *Dobson*, 576 F. Supp. 2d at 187 (quotation marks omitted); *see also D'Egidio v. City*

---

[8]  The parties have not briefed the issue of whether Maine law or California law governs this defense. The parties cite authorities from both states.  *See* ECF No. 121 at 27 (citing Maine law); ECF No. 140 at 7 (citing California law).  Because Maine and California treat laches similarly, I need not decide which state's law controls this issue.

*of Santa Clarita*, 4. Cal. App. 5th 515, 533 (2016) (citing *Miller v. Eisenhower Med. Ctr.*, 27 Cal. 3d 614, 624 (1980)).

Redzone argues that NETGEAR cannot prove either unreasonableness or prejudice because Redzone notified NETGEAR of the disconnect issues with the LTE Routers within weeks of receiving them and because Redzone revoked its acceptance within weeks of NETGEAR notifying Redzone that it would no longer provide support for the LTE Routers.  NETGEAR does not dispute these facts but contends that it was unreasonable for Redzone to wait until September 2016 to revoke its acceptance of the LTE Routers because Redzone knew about the alleged defects when it accepted the LTE Routers in June 2015.  Further, NETGEAR argues that it was prejudiced because the physical and programming changes it made to the LTE Routers at Redzone's request prevents it from reselling them.

NETGEAR's argument incorrectly conflates the defense of laches with UCC Section 2-608's requirement that revocation of acceptance must occur within a "reasonable" time.  *See* ECF No. 134 at 19;  U.C.C. § 2-608.  Turning to the elements of laches, the undisputed material facts show that Redzone did not unreasonably delay asserting its rights, and that NETGEAR was not prejudiced, because (1) Redzone notified NETGEAR of the disconnection issue within about a month of receiving the LTE Routers; (2) Redzone revoked acceptance within weeks of NETGEAR discontinuing its troubleshooting support; (3) the parties were engaged in litigation related to this dispute within a week of Redzone's revocation of acceptance; and (4) Redzone filed this action two months later.  *Cf. Vemex Trading Corp. v. Tech. Ventures, Inc.*, No. H-08-3791, 2011 WL 3270841, at *6-7 (S.D. Tex. July 27,

2011), *aff'd*, 563 F. App'x 318 (5th Cir. 2014) (holding that a breach of contract claim was not barred by laches where the plaintiff knew the goods at issue were defective but accepted them anyway based "on the reasonable assumption that the non-conformity would be seasonably cured").

Because the undisputed facts demonstrate that Redzone and NETGEAR actively engaged in efforts to diagnose and correct the data stall issue during the period between Redzone's acceptance of the LTE Routers and the filing of this action, NETGEAR cannot establish that Redzone unreasonably delayed asserting its rights or that NETGEAR was prejudiced.  Accordingly, summary judgment is granted to Redzone on NETGEAR's Seventh Affirmative Defense of laches.

## III. CONCLUSION

For the foregoing reasons, NETGEAR's Motion for Summary Judgment (ECF No. 124) is **DENIED**, and Redzone's Motion for Partial Summary Judgment (ECF No. 121) is **GRANTED IN PART** as to NETGEAR's Seventh Affirmative Defense (Laches), and otherwise **DENIED**.

**SO ORDERED.**

**Dated this 20th day of September, 2019.**

                              **/s/ JON D. LEVY**
                              **CHIEF U.S. DISTRICT JUDGE**